## FAILURE TO SUPPORT A CLAIM OF MALPRACTICE BY EVIDENCE.

Common Pleas Court of Hamilton County.

### FRED MOEHLMAN v. JOSEPH RANSOHOFF.

Decided, October Term, 1914.

*Malpractice—To Support Claim of, Reliance Must be Had on the Testimony of Experts—No Guaranty Given of the Success of an Operation—Judgment of the Operator Must Control—Use of the "Lane Plate" in the Case of Fracture—Part of the Plate Removed by the Operator and the Remainder Chiseled out—Some Months Later by Another Surgeon—Claim for Damages Can Not be Based on Failure of the Operation to Prove Completely Successful.*

1. In cases where malpractice is charged the jury must be largely guided by the testimony of expert witnesses, and they can not disregard the testimony of such witnesses to the same extent as in the case of experts in other classes of cases.

2. A physician or surgeon does not insure the recovery of his patient, and all the law requires of him is ordinary professional skill and knowledge in the treatment of the cases which he undertakes; and where the plaintiff has suffered a broken arm and has sued the attending surgeon for malpractice, the mere fact that plaintiff has not recovered the full use of his arm and is somewhat crippled, does not warrant the conclusion that his condition in that respect is due to the negligence or want of skill of the surgeon.

3. Where the defendant is a surgeon of high professional standing, and experts who are called testify that in that class of cases the method to be pursued must be left entirely to the judgment of the operator and the circumstances of the particular case, and whether the proper method was followed in the case in hand they could not say, and the only evidence supporting the plaintiff's claim of unskillfulness or negligence is the fact that the recovery was less satisfactory than was hoped for, there is nothing to warrant the submission of the case to the jury.

*Ruskin & Burnett,* for the motion.
*Robertson & Buchwalter* and *H. N. Smith,* contra.

NIPPERT, J.

Opinion on motion for a new trial.

On November 13th, the court, upon motion of the defendant, directed the jury to return a verdict for the defendant in this action. The plaintiff, through his attorney, thereupon filed a motion for a new trial claiming that the court erred in directing a verdict as stated and in refusing to submit the case to the jury.

This is an action in which the plaintiff, Fred Moehlman, a carpenter of about fifty-eight years of age, filed his amended petition against Dr. Joseph Ransohoff, the defendant, setting out the following particulars, to-wit:

"That on the 12th day of April, 1912, he broke and fractured the bones of his right arm, and on the 20th day of April, 1912, the defendant holding himself out as a surgeon, plaintiff employed him, the said defendant, as such surgeon, to set said broken bones in their proper place and to attend on plaintiff until he should be cured.

"Said defendant thereupon entered upon said employment, but was negligent and unskillful in setting said bones in this, to-wit—that instead of making a proper and continuous connection between said broken bones, they were not set in their proper place, but were set together in such a way as to form an angle at the place of union of said bones, so that the bones could not and did not properly unite. Said defendant was negligent and unskillful in attending and dressing said arm, in this, to-wit— that at the place of union of said broken bones, defendant placed an iron Lane plate, which he fastened to the bones, on either side of said union, by iron screws, so as to hold the parts of said broken bones together, but because of said angle so formed and because of its weakness, said plate broke at one of the screws, and the flesh, tissue and bone of said arm, grew over and about the broken end of said plate. Said defendant permitted said iron plate to so remain for a long period of time, causing suppuration and the discharge of pus and matter.

"Plaintiff further says that because of said negligence and want of skill, by reason of the acts above related, said arm became and is sore, maimed and permanently crippled, causing plaintiff much pain and suffering.

"Plaintiff further alleges that he is permanently injured and is crippled in said arm and said arm is now useless to him, all because of the negligence and unskillfulness of the defendant.

"By reason whereof said plaintiff has been unable to be employed at his usual vocation or at any vocation or employment since said operation, and has lost the wages that he would have

earned and has been obliged to incur an expense of $500 in endeavoring to be cured of said injury, the same having been aggravated and prolonged by said negligence and want of skill of the defendant.

"To plaintiff's damage in all in the sum of fifteen thousand ($15,000) dollars, for which he asks judgment."

To this petition of plaintiff the defendant answers and says:

"That he is a surgeon, and was so at the time complained of, and that on or about the 20th day of April, 1912, he was called upon to examine and treat a fracture of the bones of the right arm of this plaintiff.

"Defendant denies that he was negligent or unskillful in setting the bones of said arm, and denies that he was negligent or unskillful in attending and dressing said arm, and further denies all carelessness and negligence on his part, and says that he at all times exercised due and proper care and skill, and gave the plaintiff due and proper care, and says that he is not responsible or to blame for any deformity or condition of the arm of the plaintiff.

"Further answering, the defendant denies each and every averment of fact contained in the amended petition of the plaintiff not herein expressly admitted.

"Wherefore, having fully answered herein, the defendant prays to be dismissed hence with his costs."

The testimony showed that Moehlman, the plaintiff in this case, was badly injured on the afternoon of April 12, 1912, while in the employ of a local contractor, suffering a severe fracture of the bone in the upper right arm, called the humerus. In this action against Dr. Ransohoff we are called upon to pass upon alleged subsequent damage to Moehlman due to the alleged negligence of the doctor, who is charged by the plaintiff, not only with unskillfulness in setting of the bones, but also with unskillful treatment of the fracture after the same had been set.

If the plaintiff can establish, even by a scintilla of evidence, either of these two allegations of negligence, it would be the court's duty to submit the case to the jury for its consideration, and if the plaintiff had established either of these two allegations of negligence by a preponderance of the evidence it would have been the duty of the jury to return a verdict in plaintiff's favor.

Now the burden of proof is upon the plaintiff to show, first, that the surgeon was negligent and unskillful in the treatment which he gave the fractured arm, that is, that the surgeon failed to exercise the proper care in setting the bone; and, second, that the surgeon was negligent and unskillful in the performance of his duty towards the plaintiff in the care and attention bestowed upon him during the further treatment of the injury, and that in this respect he failed in the duty which a physician owes his patient and therefore was liable to the patient in damages.

This is a somewhat difficult case, in this respect, viz., that in complaints of this kind, that is, in cases where malpractice is charged, the jury must be largely guided by the testimony of expert witnesses and can not disregard the testimony of such experts in this class of cases the same as they might disregard expert testimony in other cases where the members of the jury themselves may have some peculiar knowledge of the things in controversy, for instance, as to land values, as to building contracts, condition of the weather, etc.; but in malpractice cases of this nature where it requires the study and knowledge of a science as complicated and as difficult as the science of medicine, the court and jury must necessarily be guided by the testimony of experts—experts in this special science. We can not be guided in our deliberations as to the treatment given to the patient by the opinion of laymen, because what may appear to a layman as the proper thing to do in the treatment of his injury may be the very thing which a doctor would abstain from doing, because it might endanger the life and health of the patient. In other words, when a patient places himself in the hands of a surgeon or doctor, he must rely on that doctor to use his knowledge and to bring his skill and experience and the best there is in him to bear upon the particular ailment or injury from which his patient is suffering and for the treatment of which the patient has engaged his expert services.

In the case at bar, the plaintiff, as stated above, did receive serious injury, a fracture of the upper right arm, which was aggravated by reason of the fact that this man had an unusually strong muscular development in that part of his arm, that is,

the biceps and triceps; the court can well see how that can easily be possible, for the plaintiff, being a carpenter, used tools which required the constant exercise of these muscles.

The defendant, who was called by the plaintiff as his first witness, stated that the nature of the fracture was such as is designated by the medical profession as a "flute" fracture of the humerus, while the muscular tension caused the fractured ends of the bone to override one another, thus protruding into the muscular tissue, that is, the muscles acted like a rubber band when the tension is released.

The testimony showed that immediately after the accident the injured man went to the Jewish Hospital, near his place of employment, and there "first aid" was administered by the interne and nurses in charge after which he was told to come back in a day or so for the purpose of having an X-Ray taken. X-Ray photographs were unknown a few years ago in the practice of medicine and surgery, but today they are regularly resorted to in order that the surgeon and the patient may have the benefit of the latest and best method offered by modern science in the treatment of injuries. The X-Ray plate proved the fracture to be of the nature testified to by the defendant on the witness stand. Thereupon, Dr. Ransohoff, being also surgeon in charge of the surgical ward at the Jewish Hospital, prescribed the treatment which, in his opinion, as an experienced practitioner, would offer the best chances for good results. The two fractured ends of the bone were to be brought in proper juxtaposition, so that in case of a heal the same would be as straight and perfect as the circumstances of the case would admit. In order to accomplish this end the surgeon resorted to the so-called "extension treatment" which was described to the jury as the placing of a weight upon the lower end of the fractured bone near the elbow joint and thereby gradually pulling the bones into position.

Unfortunately for the patient this treatment did not yield the desired result and an operation was decided upon by the defendant. The plaintiff was informed of this fact, and agreed and submitted to the operation, which was performed at the

Jewish Hospital about the fourth day after Dr. Ransohoff took charge of the case.

In the operation the surgeon resorted to the so-called ''Lane plate'' treatment, a treatment so named after the inventor of this process, Dr. Lane, of London. The purpose of this plate is to assist fractured bones to keep their proper position by means of the metal plate. The bones being injured and broken have not the same power of resistance against the powerful muscles as they would have in their normal state, so a metal plate is screwed into the bones for the purpose of assisting nature. It appears from the testimony that the bones being somewhat brittle the screws were not sufficient to hold the plate in the required position and the operator had to resort to the use of silver wire in binding the plate to the bone.

Now coming to the first charge of negligence upon which the plaintiff relies in his claim for damages against the defendant, to-wit: that these bones were not set in their proper place so that the bone would not and did not properly unite—there is no evidence in the record to show that the surgeon was unskillful in the performance of the operation itself, nor is there any evidence that the defendant failed to use a proper and recognized method of treatment in this case. The mere fact that the plaintiff has not the full use of his arm and that he is somewhat crippled, does not permit us to conclude that that was due to the negligence of the attending surgeon rather than to the misfortune of the plaintiff in meeting with an accident of as serious a nature as the evidence shows this to have been.

Before we could come to a conclusion, or before the jury would be permitted to deliberate upon the issues in this case, there must be some evidence as a basis for their deliberation, that is, some evidence of negligence.

A doctor or surgeon does not stand in the same relation to his patient as an accident or health insurance company, where the insurance company is liable as soon as the damage has been proven, for while it is easy to prove damage to a person's health, it does not necessarily follow that the doctor is responsible for such damage. He does not insure the recovery of his patient

from the wound or ailment for the treatment of which the patient engages the services of the doctor.

A surgeon is not a warrantor of cures. All that he is required to do, and all that the law requires of him, is to possess and exercise ordinary skill and knowledge in his profession in the treatment of every case which he assumes or undertakes to treat, and that he use reasonable and ordinary care and diligence in the exercise and application of his skill and knowledge to accomplish the purpose for which he is employed. ·And if he does not possess an ordinary degree of knowledge and skill, or is negligent and careless in his treatment of his patient, and an injury results to his patient by reason thereof, without any fault or negligence on part of the patient, then the surgeon would be liable in damages to his patient for the injury caused by his negligence and unskillfulness.

There is no question as to the superior skill and eminence of the defendant in the field of the science of surgery and medicine. So that, we are only called upon to determine whether he used his great skill and learning in the treatment of the plaintiff's injuries.

Now, what does the evidence show in the case at bar pertaining to the other particular allegation of negligence, to-wit: failure to exercise proper care and skill?

The plaintiff testified in support of his allegation of negligence against the doctor that after he recovered from the anaesthetic after the operation and while he was still "pretty sick" he looked at the wound through what he called a window, from which the bandage had slipped, exposing the wound beneath, and in answer to his attorney's question to describe what he saw when he looked in there, he answered as follows:

"A. I looked in there and I see some wire sticking out, two bunches of wires, one here and one about 3 inches up; they was twisted around, and one of them the lower one what was twisted all the twist was open.

"Q. Where were they twisted, Br. Moehlman? A. Right on top; they was overturned like you—

"Q. Over the skin, over the bandage, over the bone? A. Over the bone. I could look right on to the plate, right on to the plate, it was that much open, the cut.

"Q. What do you mean by the plate? A. I could see the center of the plate there in where the break was.

"Q. You mean the iron plate? A. The iron plate.

"Q. How long did you stay that way? A. Well, the nurse saw it first, one of the nurses. I saw it but I couldn't say much; then the nurse came to the bed and looked at it, she put the bandage on again, laid it on. I had some kind like a sand bag under me, on that arm, it fell over the back and got on to the floor and she took a different one and put it on.

"Q. What fell over the back and down on the floor. A. That bandage, that stuff what they had on my arm.

"Q. How long did it stay that way; how long did that wound stay the way you have described? A. It stayed that way until it started to heal a little afterwards.

"Q. And how long was that? A. I couldn't say that, it was a good while, but they called Dr. Ransohoff's attention to that. They said, 'We can't catch him today.' That was on Sunday

"Q. Who couldn't they catch that day? A. Dr. Ransohoff, they said he wouldn't come today, he aint going to come today. They said, 'Now we got to wait until Monday what we do,' they say, and they left it go, but Monday morning he came and looked at it, and I—

"Q. Let what go? A. They didn't—I don't know if they notified him or not, but he come Monday.

"Q. Notified him of what? A. That my arm was in bad condition that way.

"Q. That what was the matter with your arm? A. That cut was open.

"Q. Go on; when did you see Dr. Ransohoff? A. Saw him Monday morning then about half past 9 or nearly 10 o'clock, something around there; he came there with the head nurse; she was with him, come to my bed.

"Q. Yes. A. He says—I had tears in my eye and I didn't feel well, and I looked at him and I was afraid of the arm that way. So he says, 'What's the matter, Mr. Moehlman?' Well, I said, 'I believe the whole thing got loose some way or another.' He looked at it and he didn't say much. They was talking; he was talking to the nurse, but I didn't understand what he says, but he says, 'He is walled in, we got plaster all around him, that will hold all right. You are all right, Mr. Moehlman,' he says, 'You don't have to worry yourself about that; you are all right,' he says, 'your arm is all right."

"Q. Did he make an examination of your arm? A. He just looked at it.

"Q. Where did he stand when he looked at it? A. He was standing right alongside of me alongside of the bed, like the bed —I lay in the bed this way, he stood there and looked at it.

"Q. Did he pick your arm up? A. No.

"Q. Did he do anything to it? A. No, he says, 'Can't do nothing to it now,' that's what he said to the nurse, but he says, 'He is walled in, he is all right, he can't move.'

"Q. What did he say to the nurse? A. 'He is walled in,' he says.

"Q. Then what was next done to your arm; was anything done to it that day? A. Nothing at all."

Giving the patient the benefit of the doubt and granting that his observation of the wound and his own conclusions are correct, namely, that that which he did see was the wire around the plate and that there was a break in the plate, and that he called the doctor's attention to it, and that the doctor after looking at the wound and consulting with the nurse about it did not do anything further to it at that time, taking the plaintiff's statement at its full value, even then this court can not say that there was any evidence of negligence against the doctor. The doctor himself testified that he was not absolutely satisfied with the result of this operation but that he thought best at that time not to disturb the wound any further.

But it is claimed by plaintiff that Dr. Ransohoff made *no* examination of the arm at the time when Moehlman was worried about it after the operation. This is not borne out by facts as shown by the evidence. Of course, Dr. Ransohoff did not put the patient back on the operating table, but he *did* examine the arm and wound. Moehlman himself admits it when he testifies that "He (Dr. Ransohoff) looked at it," and said "He (Moehlman) is walled in, we got plaster all around him, that will hold all right. Can't do nothing to it now. He is walled in, he is all right, he can't move."

Such testimony does not show any neglect on part of the surgeon, in fact it shows that he did examine it and used his own best judgment.

Who is to say in such case what course the surgeon should have pursued—the patient, the jury, or the attending physician?

If the patient or the jury are to be the final arbiters of the method of treatment that should be pursued in a given case, then our courts would be swamped with so-called "malpractice" suits against the medical profession, and the practice of surgery would become a most hazardous occupation.

The question here presented is, whether or not a reasonable, careful surgeon would have done as Dr. Ransohoff has done in this instance.

We have the testimony of the plaintiff's expert witnesses, to-wit: Dr. Echmann and Dr. Davis, both of whom testified that the method to be pursued in cases of this kind must be left entirely to the judgment of the operator, and whether the operator has pursued the correct method depends upon each particular case, and they could not say that under the circumstances Dr. Ransohoff pursued the wrong course either by inserting a Lane plate or in failing to disturb the bandage two days after the operation, considering all of the circumstances of the case, such as the condition of the patient, the condition of the wound, etc.

So, there is no evidence which would warrant the court to send this case to the jury upon the first allegation of negligence made against the doctor, for the jury will not be permitted to speculate upon the alleged negligence of the defendant, for negligence must be positively and affirmatively shown to have existed before the plaintiff will be entitled to recover.

Now as to the second allegation of negligence, to-wit: that the doctor failed to exercise proper care and skill in the further treatment of this wound and permitted the Lane plate to remain in the arm for such a length of time as to cause suppuration— the evidence of the plaintiff's own witnesses shows that it is customary to leave the Lane plate in the arm until it becomes incrustated and part of the arm-structure, and that it is only in such cases where after a certain length of time the treatment fails that the plate is removed. There is, however, some evidence that the plate broke and the patient charges the doctor with negligence in permitting the broken plate to remain in the wound for such a long period of time as "to cause a discharge of pus and matter."

Again we must refer to the testimony of the surgeons. It appears from the evidence that Moehlman remained in the hospital about four weeks after the operation and that after that he was under the defendant's observation continually either at the Jewish Hospital or at the doctor's office and that about the middle of August a part of the Lane plate was removed. The testimony of all of the doctors who took the witness stand appears to be uncontradicted that in cases of this kind the treatment accorded to the patient, either by way of an operation or otherwise, must be left to the judgment of the operator or surgeon in charge, and no witness testified that the failure to remove the remaining part of the Lane plate could be considered negligence, for, as stated above, it is the usual custom to leave the plate in the arm. The testimony further showed that that part of the plate which the doctor left in the arm became so incrustated that when it was finally removed by Dr. Davis, in December, 1912, it had to be chiseled out of the bone before it could be removed.

The question that arises at this point is, whether or not Dr. Ransohoff was negligent in not removing the other part of the plate before the patient left his care.

There is no doubt that the wound and fracture did not heal as readily as both the patient and the doctor had hoped. Neither is there any doubt that some infection took place. But the court can not say from the evidence that the infection was due to any negligence on part of the doctor, nor is there any evidence to show that the infection was due to the treatment.

The testimony shows that after the August operation the patient came to Dr. Ransohoff's office every day and was treated either by the doctor or his partner, Dr. Louis Ransohoff. There is no evidence at all in the case to show that either of the two surgeons, or both of them, were careless or negligent in their treatment. There is no doubt that the plaintiff suffered excruciating pain, but that does not prove that the doctor was negligent. Very often human beings have to undergo great temporary suffering and pain in order that they might get permanent relief, and we deprecate the suffering of those who have

been injured, but you can not hold liable a doctor who appears in the role of a Good Samaritan, when the doctor is not responsible for the primary cause of the suffering—as in this instance the doctor was certainly not responsible for the unfortunate accident which befell his patient. The pain which the plaintiff was suffering at the hospital and while undergoing the treatment was rather the means to an end, and the doctor knew as well as the patient that his treatment entailed a great amount of pain and suffering, and while we may admit for the sake of argument that all of these facts existed, yet there is no evidence in this case which would show that the surgeon was careless or negligent.

We find that when Dr. Ransohoff returned from his vacation, in September, the plaintiff was still a regular caller at his office and a part of the Lane plate was still in the arm. The plaintiff testified that the doctor bandaged his arm and gave him treatment until about the last day of September, when some dispute arose between the surgeon and the patient and the patient was told in so many words that he could go and get another doctor if he was not satisfied with the work that Dr. Ransohoff was doing for him. This was sufficient notice to the patient to feel at liberty to consult other surgeons regarding his arm, but he really did not go to another doctor then, but he came back the very next day and received treatment from Dr. Louis Ransohoff, and it was a day after that that he visited Dr. Davis of Newport, Kentucky, discharging *ipso facto* Dr. Ransohoff.

Dr. Davis did not testify that he was going to operate on the arm at that time. He said he wanted to have an X-Ray taken, and on October 1st an X-Ray photograph was taken by Dr. Snow of Norwood, Ohio.

Now comes a period of doubt; a period of about ten weeks, where the evidence is very conflicting. At any rate, taking the plaintiff's own testimony, it may be concluded that neither Dr. Ransohoff or his son saw the patient after the patient had consulted with Dr. Davis. It may also be considered proven that the plaintiff did not visit Dr. Davis after October 7th until about December 14th, when Dr. Davis sent the patient to

Bethesda Hospital for an operation, which was performed soon thereafter and the remaining part of the plate was removed from the arm. Dr. Davis testified that the arm was then (December 14th) badly infected and he removed the Lane plate by "chiseling" through the bone.

There is very little evidence before the court as to what Moehlman was doing between October 1st and December 14th. He certainly was not in charge of Dr. Ransohoff, the man whom he now desires to hold responsible for not removing the plate. We do not know when or how soon Dr. Ransohoff would have removed the plate had the patient remained under his care, or whether he would have removed the plate at all.

The fact remains that there is nothing in the evidence which would warrant this court to submit this case to the jury, as there is *no* evidence supporting plaintiff's claim of negligence against the physician.

Dr. Eckman of Covington, Kentucky, one of the experts called on behalf of the plaintiff, said: "We would keep that plate in the arm in most cases, except in case of infection, and whether the plate should have been removed by Dr. Ransohoff depends entirely upon the condition of the patient, and no one is a better judge of that than the doctor in charge."

The attention of the court has been called by the attorneys for plaintiff to the recent decision of our Supreme Court in *Gibbs* v. *Village of Girard,* 88 Ohio St., 34, in which the court reaffirm the principle of the "scintilla rule" in Ohio, which means in effect that no matter how slight the evidence may have been to support plaintiff's contention, the case must be submitted to the jury, for it is the inalienable right of the party to have the weight and sufficiency of his evidence passed upon by the jury, a right which he can not be deprived of by the court.

The court does not differ from learned counsel on this proposition of law; but it is also undisputed that the burden is upon plaintiff to support, by some evidence, each fact indispensable to the right of action, and if he fails to do so it becomes the *duty* of the court to arrest his case from further consideration of the jury and direct a verdict for the defendant.

The plaintiff in this case has failed to sustain, in the opinion of this court, the allegations of negligence set out in his petition by any evidence, and the motion for a new trial must therefore be overruled.